Moncure, P.
On the 19th day of May 1863, when Coffman sold his land at public auction, Joseph Spriggs held a judgment against said Coffman and his sureties, Poague and Eads, for $2,500, with interest thereon from the 1st of December 1858, till paid, and costs, which had been confessed in 1859, and was wholly unpaid. This judgment had been duly docketed, and was perfectly secure ; being a lien .upon all the lands owned by the debtors at its date, and each of them then owning land of much greater value than the amount of the j udgment. Spriggs had a perfect right, at any time, to enforce its full payment, in good money, out of the said lands. Confederate treasury notes and Confederate bonds had greatly depreciated in their market value ; being then, as compared with gold, only of the value of about seven to one. In this state of things, Spriggs, certainly, had a right, notwithstanding this great disparity of value, to receive payment of his judgment in Confederate notes or bonds, at their par amount. He was not bound, in law or morals, to make so great a sacrifice ; but he had a right to do so, upon the principle that a man may give away what is his own, or any part of it. His mere declaration or promise that he would receive payment in such a way, founded on no valuable consideration, would not, of itself, bind him. Such a declaration or promise, at most, could be no more than an unexecuted gift, which is never binding. But it would not even amount to an executory gift. It would be a mere indication of his *223 willingness, for the time being, to accept payment of the debt in a depreciated currency, and not of his consent to do so at any future time, however much the currency may ■ have further depreciated in the meantime. It is well known that Confederate currency was not only greatly depreciated in May and June 1863, but continued thereafter to depreciate, and sometimes rapidly, until the end of the war, when it entirely perished. And although there doubtless were some persons who, under peculiar circumstances, were willing, as late as May or June 1863, to accept payment of a well-secured ante-war debt in such a currency, provided such payment were immediately made ; yet there were few, if any, who would then have consented to accept such payment at a future period, especially if remote or indefinite. Still, a promise to accept such payment might have been made under such circumstances, and in such terms as to become binding on the creditor, either as a contract founded on a valuable consideration, or as an equitable estoppel. If, for example, Jos. Spriggs, the judgment creditor in this case, to enable the principal debtor, Coffman, to sell his land for Confederate money and make a good title to the purchaser, had agreed to accept payment of the judgment in Confederate notes or bonds ; and if, in pursuance of such agreement, Coffman had immediately advertised and sold hi3 land, received payment of the purchasers, according to the terms of sale, and conveyed to them the land, it would then have been too late for Spriggs to revoke his agreement and retract his promise to accept such payment, and hispromise would have been binding upon him, not only in behalf of Coffman but of his sureties also and of the purchasers of his land. It is immaterial to enquire whether this operation would be produced by considering the promise as a contract founded on valuable consideration, or as an equitable estoppel. One or the other, or both, it would certainly be. But whether one or the other, or both, the effect would be precisely the same. Regarding it as a *224 contract founded on valuable consideration, there would to its binding effect. Regarding it as an edn’'ta^e estoppel, it would be equally binding, on the ground that it would be a fraud in the judgment creditor t° retract his consent after it had been acted on by the j udgment debtor and his sureties and the purchasers from him, in faith cf such consent, which had been given to induce such action. Perhaps it might properly be regarded both as a contract and as an equitable estoppel. The doctrine on the subject is fully laid .down in the authorities cited by the counsel for the appellants, to wit: The Duchess of Kingston's case, 2 Smith’s Leading Cases, Amer. ed. of 1866, and the notes, pp. 648-843, top paging; Davis' adm'r v. Thomas, 5 Leigh, 1; Pettit v. Jennings, 2 Rob. R. 676. But to produce that important effect, it certainly ought to be clearly proved that the promise was actually made, and on such consideration or under such circumstances as to make it binding on the promiser. . Having made these preliminary remarks, which seemed to me to be appropriate, I now proceed to the more particular examination of the case we have before us.
The answer of Poague and Eads, the sureties of Coffman, sets out the ground on which they rely for their discharge from liability as such sureties. They say they occupied a position of perfect security after the confession of judgment by Coffman for the debt for which they were liable. That some time in the year 1863, Coffman, being from home, and doing duty in the army of the Confederate ■ States, and being anxious to sell his mill property, addressed a 'letter to the complainant through his friend Sanders, and enquired whether he would accept Confederate money or bonds in discharge of the judgment debt due to him by Coffman as principal debtor, and by the respondents as sureties. That complainant replied to the letter, and consented to accept Confederate bonds in payment of his judgment; *225 and, in consequence of this consent, Coffman, with the assent of the respondents, sold the real estate described in the bill to the two parties therein named, and §2,800,-part of the proceeds of the sale, were paid over to the respondents for the purpose of investment in Confederate States bonds for the benefit of the complainant. That they did actually invest the amount for the benefit of the complainant, at their earliest convenience after receiving the money, and the said bonds have been in possession of the respondent Eads ever since. That no formal tender of said bonds was ever made to the complainant, he having subsequently waived the necessity of such tender, by announcing that he would not accept them. That some time after the sale, and the execution by the respondents of the receipt and obligation marked Ex. B, and filed with the bill, the complainant addressed a second letter to Sanders, saying that he had changed his mind, and concluded not to accept the Confederate bonds in payment of his debt. That they have made the most industrious efforts to get possession of these letters of the complainant, but without success, and therefore rely on secondary proof of their contents. That they were alone induced to consent to the sale by the promise of the complainant to accept Confederate bonds in satisfaction of his debt; and they insist that the formal, deliberate consent of the complainant thereto, and the action of Coffman and these respondents based upon it, estopped the complainant in equity from shifting his ground, by withdrawing his consent, and that he has thereby released in equity his judgment lien upon the said respondents.
The only other answer filed in the case, is that of Brady, a purchaser of a part of the land of Coffman at the sale aforesaid. He did not, it seems, know of the existence of the judgment until after the sale: hearing then that the judgment constituted a lien on the land, he declined to pay his purchase money, until the said land *226 was released from or protected against the said judgment lien. He says that Eads and Poague, the sureties of Coffman, and for whose protection the said judgment was confessed by the said principal and his sureties without the knowledge of complainant, accordingly met on the 4th of June 1863, and executed the paper filed with the bill as exhibit B, by which they acknowledge the receipt from Coffman of $2,800, the amount of said judgment ; released his land from the lien of said judgment, and obliged themselves to pay the same and protect his vendees from the lien thereof; upon the faith of which, the said vendees paid the purchase money, and on the same day received deeds for the laud. And he insists, that the said land is thus release i from the lien of the said judgment; and if not, that the lands of the sureties, which are ample for the purpose, are bound for the satsfaction of the said judgment in exoneration of the land of Coffman by virtue of the release and obligation executed by the sureties as aforesaid.
I think neither of these answers, of the sureties or of the purchaser, states such a promise of the judgment creditor as would operate, either by way of contract or of equitable estoppel, to prevent him from enforcing his judgment lien on the land, as claimed in his bill. It is not pretended that he was present at the salé when it was made, or that he was even in the county in which it was made, either at that time or for a long time before or afterwards. In fact, it appears that he was in a distant county, engaged in the discharge of his duties as a minister of the Methodist church. The only application mad to him on the subject was by letter sent by mail, addressed to him by Sanders in behalf of Coffman, enquiring whether he, Spriggs, would accept Confederate money or bonds in discharge of the judgment debt. ■Spriggs replied to the letter of Sanders, (as stated in the answer of the sureties), and consented to accept Confederate bonds, in payment of his judgment. Andinconse *227 quence of this consent, Coffman, "with the assent of his sureties, sol d the real estate described in the bill to the two parties therein named, andthe$>2,800 mentioned in the exhibit marked B, part of the proceeds of sale, were paid over ■to the sureties, for the purpose of investment in Confederate bonds for the benefit of the complainant. It does not appear that anything was said in the letter from Sanders to Spriggs about the sureties of Coffman, or the judgment lien, or any release of it by the sureties. It -does not even appear that anything was said in that letter about a sale of the land by Coffman. The only subject of the letter, as stated in the answer of the sureties, seems to have been a simple enquiry of the complainant, “ whether he would accept Confederate money or bonds in discharge of the judgment debt.” And the only subject of the complainant’s reply to that letter was, that he “consented to accept Confederate bonds in payment of his judgment.” He did not say that he would come under any obligation to accept such payment, even at that time, much less at a future or indefinite time. All he meant to say was, that, as then advised, he was willing to accept such payment. But he might change his mind at any time, and nothing was more natural or probable than that he would change it in a very short time, as Confederate securities were rapidly, .and almost daily depreciating. He would no doubt have refused, if he had been requested, to bind himself, even for a day, to accept such payment. The wonder is that he was then willing to accept it. He had no reason to believe that there would be any definitive action by Coffman or his sureties, founded on the faith of his willingness to accept Confederate bonds in payment of the judgment. He no doubt expected that there would be no sale, and, still more, no release of the judgment lien, without his presence and co-operation, in person or by special agent. Such is the case made by the answer of the sureties. The case made by the answer of Brady, *228 the purchaser, is still less strong against the complainant» The purchase was made without knowledge, even of the es^slence 0;f lhe judgment lien. And though its existence was known to the purchasers when the purchase money was paid, yet such payment was made, not upon the faith of any promise of the complainant to accept Confederate bonds in payment of his judgment, and to release the lien thereof, but upon the faith of the release of such lien by the sureties, aud of their covenant of indemnity against it. In fact, the answer of Brady shows that he regarded the sureties, as being, in effect, the owners of the judgment, and having a right to release it, as it was confessed, for their benefit; and at all events, that he relied on the judgment lien, on the lands of the sureties as ample indemnity against the said lien on the land of Coffman, purchased by him.
But even if the answers, or either of them, state a good ground of defence, either by way of a promise founded on valuable consideration, or of an equitable estoppel, let us now see whether it is sustained by the evidence, which, as we have seen, ought to be strong and clear to have that effect.
It is unfortunate, in the last degree, for the defence in this case, supposing it to be well founded in fact, that the answer of Spriggs to the first letter alleged to have been written him by Sanders, and his answer to the alleged second letter of Sanders, had not been preserved and ex_ hibited as evidence in this cause ; and it is very strange that Sanders, Coffman, the two sureties, Eads and Poague, and the two purchasers, Brady and Burks, or some one or more of them, did not feel such a deep sense of the importance of those answers, as to be induced to preserve them carefully, and especially the first of them. Instead of that, both of these answers are alleged to have been, lost, and secondary evidence of their contents is offered, and that evidence of the most uncertain nature, being the vague recollection of witnesses after the lapse of sev *229 eral years ; such wituesses being either interested parties, or so connected with the transaction as to be in danger of being strongly biased in giving an account of it. Such testimony of such witnesses, however honest they may be, (as the witnesses in this case no doubt are), is almost ■sure to be highly (though it may be insensibly) colored in favor of the side on which it is offered, and it is a very unsafe foundation for the judgment of a court. A mistake as to a date, or a single word, may cause a wrong ■decision and produce the grossest inj ustice. And it would be dangerous to found a decree on such testimony, however express, and positive, and uncontradicted by other evidence it might be. But when it is denied by the testimony of the opposite party, (who is also examined as a witness,) and is inconsistent with clearly established facts in the case, it is certainly insufficient to warrant a court in rendering a decree which would adj udge that party to have given up for nothing, seven-eighths of an admitted and undeniable debt, secured by the best possible security. How does the case stand upon the evidence %
Five witnesses were examined whose evidence is material to this enquiry; four of them against the claim of the judgment creditor, and one only in its favor. Of the four against it, one of them, Sanders, was the brother-in-law of the principal debtor, Coffman, and son-in-law of the surety, Eads, and was also the agent of ■Coffman in writing the first alleged letter to Spriggs, ■and it seems the agent of the surety, Poague, in writing the second alleged letter to Spriggs. Another of them, Mrs. Lauck, was the daughter of said Eads. . And the remaining two were the said Eads and Poague themselves. The witness on the other side was the plaintiff himself, the judgment creditor, Spriggs. The character for veracity of none of these witnesses is impeached, and it seemed to be admitted in the argument of counsel on both sides, that they are all persons of good general character. There is nothing in what they say, nor in *230 their manner of giving testimony, so far as it appears upon the record, which at all indicates that any of them intended to make a misstatement. And the only ground on which any of the testimony can be impeached or questioned is, defect of memory of witnesses testifying to what occurred several years before, and the great danger of their having been insensibly biased in giving-their testimony, by their interest in the transaction involved, or connection with it and with the parties interested therein. Certain it is that if the testimony of the plaintiff, Spriggs, is to be believed, there is no ground whatever to sustain the defence relied on. And. if it be conceded that the testimony on the other side, standing by itself, would be sufficient for that purpose, still it might well be questioned whether the court would-be warranted in deciding against the plaintiff in such a case of conflicting testimony, even though a majority, in number, of the witnesses giving such testimony, might be on the side of the defendants. In this case, however, I think it will be found that there are facts and circumstances, not dependent on the loose and vague recollection of witnesses, which decidedly turn the scale in favor of the plaintiff'.
The theory of the defence is, that before the sale of the land of Coffman, or at all events before the purchase money was paid and before the sureties, Eads and Poague, released the judgment lien upon the land and bound themselves to indemnify the purchasers against it, a letter was written by Sanders in behalf of Coffman to Spriggs to enquire if he would .take Confederate money or bonds in discharge of the judgment, and Spriggs replied to that letter that he would take Confederate eight per cent, bonds; and upon the faith of that reply, the sale of the land was made, the purchase money paid, and the release and bond of indemnity aforesaid executed. The facts on which this theory rests, are all, as we have seen, denied by the testimony of the plaintiff.
*231 How, lohen this letter of Sander’s was written, what was its precise purport, when the answer < f Spriggs thereto was received, and what was its precise purport, - are all very important elements in the defence relied on. Sanders is the only witness in the case who testifies as to when his letter was written, or what was its purport; and he testifies alone from memory, and nearly four yeara after the letter is alleged to have been written. Being asked, in his examination in chief, to “state as near as you can, the contents of your letter of enquiry to Mr. Spriggs?” he answered: “I believe about the substance of it was this, that I addressed him a note at at the request of Mr. Coffman, to know if he would take Confederate money or bonds in liquidation of his judgment, to which Poague and Eads were security, and if so, to answer by return mail, or as early as possible ; that Coffman wanted to sell his property and pay his debts.” And being lurther asked, “How soon afterwards did you receive his answer ? ” he replied: “ About a week; I received the letter by mail, as soon as it could be expected to come.” The account which he gives of the contents of this alleged letter of Spriggs is, that the writer said “he would take Confederate eight per cent, bonds; and further remarked, that if Confederate bonds were not good, he did not consider anything in the shape of property good; that if the yankees w hipped us, all would go up together.” Eads in his testimony says, he saw this letter of Spriggs, and that its purport corresponded with the account given of it in the testimony of Sanders. Both of them say this letter was received before the sale, and Eads thinks it was received before the land was advertised, which was on the 22d of April 1863.
I have already remarked upon the importance of every word of these letters, and of the danger of entirely altering their sense by misstating, from defect of memory alone, a single word of their contents. Spriggs says: *232 “ I never consented to take Confederate money for that judgment. I did say to my family, and perhaps to some of my Mends, that if they would give me eight per cent, bonds at pari would receive them ; they were then at a premium of eight per cent. I do not recollect whether this was before the 19th of May or 4th of Jnne 1863. I think it was after I had received Sanders and Coffman’s letters of the 21st and 25th days of May 1863. I think I heard through a friend that the property had been sold, but these letters contained the first direct information that I received. I was not consulted about the sale of the Bunker Hill mills or land before the sale was made.” “I never said to Jas. R.Sandersin a letter to him, that I. recollect of, that I was willing to take eight per cent, bonds at par for that judgment.” “I would have received eight per cent. Confederate bonds at any time before they commenced depreciating.” “ I never had any of them— never dealt in them, and never had any offered to me. It was suggested to me in the Sanders letter, and the conversation with my family and friends was after I received that letter, and I expressed myself willing to take those bonds in order to settle up the matter. Although I expressed this willingness to my family and friends, not having been in Rockbridge but once dui’ingthe war, I had no opportunity of saying the same thing to Mr. Sanders, or to any of these parties. I did not mention it in my answer to Mr. Sanders, because I had not matured my thoughts on the subject. That letter was written very soon after I reeeived his. I do not mean to say, positively, that I did not make that offer in my letter to Mr. Sanders, but I have no recollection that I did.” He produces the only letters he admits ever to have received on the subject, being the two letters received from Sanders and Coffman of the 21st and 25th of May 1863, as before mentioned, which will be presently more fully noticed. Having preserved those letters, he would no doubt also have preserved any other letter written *233 Mm by Sanders on the same subject. And if he had preserved it, no one cau read his testimony and doubt that he would have produced it.
The two letters produced by Spriggs are of the utmost importance in this case, as they were written at the time of the transaction by two of the chief actors in it, and were two very material links in the chain of that trans- . action. There can be no doubt of the accuracy of the facts which they state, and they throw much light on those facts to which the parol testimony refers. They ■furnish tests to be applied to what is stated by witnesses ■on loose aud vague recollection, and will enable us to detect, to some extent, the mistakes into which those witnesses, or some of them, have no doubt fallen.
Both of these letters were written after the sale of Coffman’s land, which was on the 19th of May 1863, but before the purchase money was paid, and before the release and covenant of indemnity was signed by the sureties, which was on the 4th of June 1863, just sixteen days after the sale. One of these letters is from Coffman, and is in these words :
‘£ Fairview Hospital, May 21st, 1863.
“Bev. Jos. Spriggs, DearBro.,—I just concluded the sale of Bunker Hill mills, and write to you to say that the money is ready for you, and I shall be very glad if you would make arrangements immediately to bring or send your note over here for collection. I have money, and don’t want to pay interest on it any longer. By .•early attention to this, you will much oblige,
Tours, &c., J. H. Corfman.”
The other is from Sanders, and is in these words :
“ Sanders’ Store* May 25th, ’63.
“Bev. Joseph Spriggs, Dear Sir,—At the request of ~W. F. Poague, I drop you these few lines to say to you that Mr. J. H. Coffman has just sold the Bunker Hill mill, and that Mr. Coffman is ready to pay you off', provided you will take Confederate money or bonds. I *234 would say that the bonds draw eight per cent, and I prefer them to any other bonds. Mr. Poague says if you do not receive the payment, you will have to release him. You will answer this as soon as it comes to hand. You, will address me. We are well. I hope this may find you the same. Your friend,
Jas. E. Sanders.”
This letter was written six days after the sale, and twelve days before the purchase money was paid, and the release of the judgment lien by the sureties was executed. It seems to me that these letters, and especially the latter, are plainly inconsistent with the idea that a, letter had, two or three weeks before, as alleged, been received by Sanders from Spriggs agreeing to receive eight per cent. Confederate bonds in discharge of the judgment, or containing such a promise to that effect as would, be binding on Spriggs, or could have warranted the sureties, on the faith of such promise, in giving a release of the judgment lien on the land of Coffman. Neither of these letters make any reference whatever to any such promise, as they would certainly have done if any such promise had been given. They do not even refer to any letter at all as having been recently received from Spriggs. Though if a letter had been received from him intimating that he might, or probably would, be willing to receive eight per cent. Confederate bonds in discharge of the debt, but reserving the right to do so or not at the time of the sale, as might well have been the case? there would seem to have been nothing in the receipt of such, a letter inconsistent with the terms of these two letters-of Coffman and Sanders, or either of them. But, on. the supposition that a letter had been received from Spriggs, as alleged, containing a binding promise on his part to receive eight- per cent. Confederate bonds in discharge of the judgment, or any promise on'which the sureties had any right or reason to rely, in releasing the judgment lien without any further action or consent on *235 the part of Spriggs, it is utterly unaccountable that no reference whatever is made to such a letter, or such a promise, in either of the two letters from Coffman and Sanders as aforesaid. Had such a letter been received from Spriggs, containing such a promise, Coffman and Sanders, in their letters of the 21st and 25th of May ’63, would, after informing him of the sale, and of the readiness of Coffman to satisfy the judgment, have enquired, when, where, and to whom, the eight per cent. Confederate bonds could be delivered in payment of the ' judgment, according to such promise. Instead of that, Coffman, in his letter, says: “ I write to you to say, that the money is ready for you, and I shall be very glad if you would make arrangements immediately to bring or send your note over here for collection. I have money, and don’t want to pay interest on it any longer.” How, here is no reference to the judgment lien, or judgment at all; nor to eight per cent. Confederate bonds, or any promise of Spriggs to receive such bonds. The writer speaks merely of a debt due by note, which he requests the creditor “ to bring or send over here for collection,” and says, “the money is ready for you.” It is not pretended by any of the witnesses, that Spriggs, in the alleged letter to Sanders, or otherwise, ever promised to receive Confederate treasury notes in discharge of the debt. The most that any of those witnesses say is, that he promised in that letter to receive eight per cent. Confederate bonds. And Sanders, in his letter, says: “Mr. Coffman is ready to pay you off, provided you will take Confederate money or bonds. I would say that the bonds draw eight per cent., and I prefer them to any other bonds.” Would he have used this language, or anything like it, if, just two or three weeks before, he had received a letter from Spriggs agreeing to receive eight per cent. Confederate bonds in discharge of the judgment, such agreement having been made, as alleged, to enable Coffman to sell his land, and if, on the faith of such agreement, Coff *236 man had accordingly made the sale, and received the purchase money ? “ Coffman is ready to pay you off', provided you will take Confederate money or bonds.” Does not that language necessarily imply that Spriggs bad still a right at his election, notwithstanding any letter he may have previously written, either to accept Confederate money or bonds, or to command good money in payment of the judgment ? It seems to me there can be no room for doubt on this subject.
• If such a letter, as is alleged, had been received from Spriggs before the sale, why was it not exhibited at the sale for the satisfaction of purchasers ? The purchasers knew nothing, even of the judgment, until after the sale when they investigated the title. Why was not the letter exhibited when the release of the judgment lien was executed by the sureties ? Steele, the attorney who drew that release did not see or hear of such a letter. The sureties undertook to give the release because they considered themselves entitled to do so, the judgment having been confessed at their instance and for their indemnity, without the knowledge of the creditor. And the purchasers were willing to pay the purchase money on the execution of this release, because they thought the sureties had a right to give it for the reason aforesaid, and chiefly because the covenant of the sureties was considered as an ample indemnity against the lien of the judgment if it continued to exist after the intended release. It is obvious that the purchasers placed no reliance on any letter of Spriggs, if they ever heard of such a letter. And it is also obvious, I think, that the release was not executed by the sureties on the faith of such a letter, as containing a binding promise on the part of Spriggs to accept Confederate bonds in payment of the debt. Although it may have been executed by them on the belief derived from some letter of Spriggs to Sanders, or otherwise, that such a payment would be accepted. When the letter of the 25th of May ’63 was *237 written by Sanders to Spriggs, at the request of one of tbe sureties, Poague, tbe sureties could not have believed that any binding promise had been made by Spriggs to accept Confederate bonds, and they obviously then intended to await the answer to that letter for-his determinate conclusion on the subject. “ You will answer this as soon as it comes to hand,” is the request of Sanders in his letter to Spriggs,-written at the instance of Poague. Why Poague did not wait till this answer was received, does not appear. Sanders says it was duly received, or received in due course of mail. At that time, no doubt, communication by mail was slow and irregular. But, unfortunately for the sureties, about ten days after the letter was written, and a few days before the answer was received, the sureties executed the release of the judgment lien, and the purchasers paid the purchase money and received deeds for the property. The parties were, no doubt, anxious to close the transaction without further delay, and the sureties, no doubt, were assured by Sanders and others, and believed, that Spriggs would accept eight per cent. Confederate bonds ; and they determined to run the risk. They received $2,800 in seven per cent. Confederate bonds from Coffman, which they knew they could hold for their indemnity, in case Spriggs should refuse to accept the eight per cent, bonds. And though they would ot course have greatly preferred to apply the bonds they received to the discharge of the debt to Spriggs for which they were bound, yet if Spriggs should be unwilling to accept payment in that way, they might still have been willing to close the transaction at once and hold the bonds for their ultimate indemnity. Their only security was the land of Coffman, which may have been bound for other judgments also. It was certainly bound for one other judgment, in favor of Wadsworth, Turner & Co., which was arranged in a similar way, to wit: by a covenant of indemnity, executed by Coffman and Eads, his surety, on *238 the same 4th of June 1863. Spriggs did not want his money and wrns willing to wait for it, being well secured. There was surely as much reason why the sureties should be willing to accept Confederate bonds in lieu of a judgment lien on Coffman’s land for their indemnity, as that Spriggs should be willing to accept such bonds in payment of a debt secured by a judgment on the lands of Coffman, Poague and Eads, each one of whom owned land more than enough to pay the debt.
The course pursued by the sureties after they were informed that Spriggs was unwilling to accept Confederate bonds in payment of the debt, as they were by the answer of Spriggs to the letter of. Sanders of the 25th of May ’63, received a few days after the release was executed by the sureties, is confirmatory of the view that they did not then regard Spriggs as bound to accept such payment. Why, if they did, did they not procure the eight per cent, bonds, which alone they now allege he promised to accept, and tender them to Spriggs in payment of the debt ? Why did they leave the matter in such a state of doubt and uncertainty, when the case required the greatest possible certainty, and when the proper course to be pursued was a very plain one ? Why did they not, at least, inform him that they considered him bound to accept eight per cent. Confederate bonds, according to his alleged promise, and that they would hold the $2,800 in seven per cent. Confederate bonds at his risk ? Why did they not then inform him of what had been done on the faith of such promise, and that he would be held responsible for all the consequences ? Why did they not thus afford him an opportunity to investigate aud litigate the transaction when the facts were fresh, and to take such means as might be deemed expedient to alleviate his loss, if it should turn out that he was liable ? Why did they remain silent and quiet till the war was over, and the seven per cent. Confederate bonds had perished in their hands, and then, for the first *239 time, deny their liability as sureties, and claim to be discharged by reason of this alleged promise of Spriggs in April or May 1863 ? These questions can, reasonably, - be answered only in one way, and that is, that there was in fact no such promise of Spriggs as bound him to accept Confederate bonds in payment of this debt, and that the sureties were of that opinion when the transaction was fresh, and all the facts were well remembered.
The arguments of the learned counsel for the appellants were certaiuly very able and ingenious, and need only one thing to make them conclusive ; but that is an all important thing—a good case. I concur, in the main, in the able opinion of the learned judge of the Circuit court. I think, with him, that there was a letter written by 'Spriggs to Sanders, indicating the willingness of Spriggs, at the time of such writing, to take eight per cent. Confederate bonds in payment of the debt; that that letter was written immediately on the receipt by Spriggs of Sanders’ letter of the 25th of May 1863, and in answer thereto ; that it was written by Spriggs under the impression produced by what was said in the letters of Sanders and Coffman, that the sale had been made and the purchase money received, and the ouly question then was, whether Spriggs would receive Confederate money or bonds in payment of the debt due to him ; that be had no idea when he wrote that letter, that it could have any effect upon any action of the purchasers or of the sureties in the matter ; that though he was then willing to take eight per cent. Confederate bonds, “ in order to settle up the matter,” and may have so expressed himself in that letter, yet he had not then, as he says, matured his thoughts on the subject, and did not, (if he could possibly have done so,) express his willingness in such definite and positive form as to be binding upon him, even for the time being, much less for any future period ; that he obviously intended, notwithstanding that letter, to retain the right to accept the bonds or not, ac *240 cording to Ms pleasure, at any time at which they might be tendered; and such intention must have appeared ' upon the face of that letter, especially when viewed in connection with all the surrounding circumstances; that when the sureties executed the release and covenant of indemnity on the 4th of June 1863, they did not regard that letter as binding. Spriggs to receive eight per cent. Confederate bonds in payment of the debt, though they hoped and believed, from the tenor of it, that he proba- • bly would do so ; that that is the letter to which Sanders and Eads refer as having been received before the sale of the land, they having obviously forgotten the date of its receipt and the substantial purport of the letter; that when the subsequent letter was received from Spriggs, announcing his determination not to accept Confederate-money or bonds in discharge of the debts, the sureties were satisfied that they had no right to insist on his doing ■ so, and they therefore proceeded no farther in their preparation for payment, but continued to hold the $2,800 in. seven per cent, bonds for their indemnity. This, I believe, is the true theory of the transaction; and it is consistent with all the facts and evidence in the case, making due allowance for some mistakes into which some of the witnesses have, quite naturally, fallen, from lapse of memory and lapse of time. But whatever the true theory may be, I am well satisfied that the sureties have not sue-ceeded in showing that the judgment lien has been released by the creditor, or that they are entitled to be discharged from liability for the debt.
I am, therefore, of opinion that the decree ought to be affirmed.
The other judges concurred in the opinion of Mon-cure, P.
Decree affirmed.